STATE OF NEBRASKA, APPELLEE, V. PAUL L. BATTS, APPELLANT.
448 N.W.2d 136

Filed November 17, 1989.    No. 88-875.

Thomas M. Kenney, Douglas County Public Defender, and Timothy P. Burns for appellant.

Robert M. Spire, Attorney General, and Susan M. Ugai for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

After a bench trial, the defendant-appellant, Paul L. Batts, was adjudged guilty of motor vehicle homicide by driving while intoxicated in violation of Neb. Rev. Stat. § 28-306 (Reissue 1985). Batts urges that the evidence is insufficient to sustain his conviction. We affirm.

The charge against Batts resulted from a collision between an automobile he was driving and in which the decedent, John A. Hurst, was riding and an automobile driven by April Dickert-Heisch. The collision took place at 4:17 during the afternoon of February 10, 1988, on Ridgewood Avenue, near the point at which it branches into a Y intersection with 84th Street in Omaha, Nebraska, as more fully described later in this opinion. Although it had snowed the night before the collision, the lanes of travel on Ridgewood Avenue were clear and dry; however, there was snow along the curbs and in the middle of the street. There was also testimony that Ridgewood Avenue

was wet and icy in spots and that the street was snowpacked at the intersection.

Earlier that day, Batts had borrowed the automobile he was driving from its owner, Michelle Shipman. Shipman had informed Batts that the automobile had mechanical problems, specifically that it unpredictably "kind of stalled out a little bit once in a while . . . ." She told him to accelerate when the automobile began to hesitate in order to prevent it from stalling.

Later during the day, Batts and two friends, Brian Caccavari and Paul Anderson, went to Caccavari's house after school. While there, Caccavari got a bottle of whiskey and one of rum from his bedroom. The evidence concerning the amount of alcohol Batts consumed and when he did so is in conflict.

According to Caccavari, Batts first drank one or two "glugs" directly from each of the bottles at about 3:15 p.m. Then Batts and Anderson went to a convenience store to get some Dr. Pepper to mix with the liquor. After they returned to Caccavari's house at about 3:20 or 3:25 p.m., Batts consumed a mixed drink from a 12-ounce paper Coca-Cola cup. To mix the drink, Batts filled the cup half full with liquor and then added Dr. Pepper. Batts then made another mixed drink of similar proportions, which he drank while the three returned to their school. Before leaving the school grounds, Batts had made another mixed drink, again containing, according to Caccavari, half alcohol and half Dr. Pepper, which Batts drank as he drove.

According to Anderson, at about 3:25 p.m. Batts drank two "slam dunks," consisting of mostly whiskey and some Dr. Pepper, from a paper Coca-Cola cup, and then drank a third drink of half whiskey and half Dr. Pepper.

According to Batts' testimony at trial, he drank no alcohol until after he returned to Caccavari's house from the convenience store and after having eaten a hoagie sandwich at about 2:45 p.m. He testified that he took his first drink of the day at 3:45 p.m., at which time he drank two 1-ounce shots of the 80-proof alcohol Caccavari had produced. He then drank two "slam dunks," one at 3:50 p.m. and one at 3:55 p.m., each consisting of 1 ounce of alcohol and 1 ounce of Dr. Pepper. Just before returning to the school building, he mixed another drink

containing 2 ounces of whiskey to take with him. He finished that drink at the school grounds at around 4:05 p.m. and then made another, again containing 2 ounces of whiskey, which he had with him at the time of the collision and from which he took two sips. Batts testified that as a result of the collision, the drink he had between his legs spilled "all over" his clothing.

In contrast with his above testimony, after Batts was arrested, he told police during a taped statement that he began drinking before going to the convenience store. He stated that after the schoolday, Caccavari said, "[L]et's go to my house and drink a little bit before we go. I said, alright. We went to his house, did about two shots, probably at the most . . . two shots . . . and [Anderson] wanted me to take him up to the store to get him a 2 liter Dr. Pepper."

According to Caccavari, somewhere between 3:40 and 3:55 p.m., Batts drove him and Anderson to the school in Shipman's automobile in order to pick up another friend, the decedent. They took both bottles of alcohol and several paper Coca-Cola cups with them. After finding the decedent in the school building, the four returned to Shipman's automobile and left, with Batts driving.

Caccavari was in the front passenger seat, and Anderson and the decedent were sitting in the back seat. Eventually, Batts made a left turn onto Ridgewood Avenue and began traveling north. The speed limit for northbound traffic on Ridgewood Avenue is 30 miles per hour. According to Batts, the automobile was proceeding at 30 miles per hour as he traveled on Ridgewood Avenue.

From the point at which Batts entered Ridgewood Avenue, the street proceeds north for about two blocks, then curves to the northwest for about a block, and then progresses northwesterly for about two blocks until reaching a Y intersection, where the street divides into two branches. One branch continues to the northwest and becomes 84th Street; the other branch retains the name Ridgewood Avenue and proceeds northeast.

As the automobile in which the four rode approached the location of the collision near the Y intersection, Caccavari asked Batts if "he could drive good when he was drunk," to

which Batts responded affirmatively. Anderson testified that as they approached the Y intersection, he saw Batts push on the accelerator and was pushed back against the seat from the impact of the automobile going forward. He told Batts, "[D]on't do that." According to Caccavari, just as they approached the Y intersection, the automobile accelerated suddenly and began fishtailing. "We were going down the street and we fishtailed towards this way, and we missed the first car that was coming, we fishtailed back that way and then we fishtailed that way again, and that's when we got smashed on the driver's side."

Dickert-Heisch, who was traveling south on 84th Street, testified that she "saw a car coming north on 84th and it was swerving, fishtailing into — it looked like it was going into my lane of traffic, and the car immediately preceding mine had just barely missed that car . . . ." Although Dickert-Heisch slowed down, there was nowhere for her to turn off the street, and the side of the fishtailing automobile struck the front end of her automobile.

A police officer for the city of Omaha, an expert in reconstructing accidents, concluded, based on the "skid marks," "yaw marks," "rotation marks," the debris located at the collision scene, the damage to the vehicles, and interviews with witnesses to the collision, that the northbound automobile driven by Batts left its lane of traffic, collided with Dickert-Heisch's southbound automobile, pushed it backward several feet, and then "rotated," during which "there was a second collision to the rear of [Dickert-Heisch's automobile] . . . ."

After the collision, Caccavari hid the two bottles of alcohol behind some bushes close to the site of the collision. Police found the bottles behind the bushes after the accident and also found lying on the floorboard of the driver's side of the automobile Batts had been driving a paper Coca-Cola cup which contained a liquid smelling like alcohol.

Batts denied at trial that he was drunk at the time of the collision. However, an Omaha police officer who investigated the scene of the accident detected the odor of alcohol on Batts' breath and noticed that Batts' eyes were red and bloodshot.

After Batts had been taken to the emergency room, another officer noticed that Batts smelled of alcohol, was talkative, and had bloodshot eyes. Based on those circumstances and Batts' demeanor, the second officer concluded that Batts had been driving while under the influence of alcohol and placed him under arrest. At one point in his interviews with the police, Batts admitted that he felt "sort of light-headed" while driving.

A sample of Batts' blood taken at 5:25 p.m. revealed Batts had a concentration of .13 grams of alcohol per hundred milliliters of blood. Considering the standard deviation, according to the chemist who testified for the State, Batts' blood-alcohol level could range from .117 to .143 grams of alcohol per hundred milliliters of blood.

A pathologist called by Batts testified that a reasonably small amount of alcohol will be absorbed into the blood in about 1 hour, that half the alcohol consumed at any time will be absorbed in about 15 to 20 minutes, and that food, especially that with a high fat content, "definitely delays absorption." He opined that if Batts drank nothing before 3:45, had eaten a hoagie sandwich earlier, then at 3:45 drank 4 ounces of 80-proof whiskey, at 3:50 drank another 2 ounces of 80-proof whiskey, between 3:55 and 4:05 drank another 2 ounces of 80-proof whiskey, and finally, at 4:05 mixed another drink with 2 ounces of whiskey, from which he took two swallows, Batts would have approximately an .08 blood-alcohol content at 4:15. However, on cross-examination, the pathologist testified that if it were assumed Batts started drinking at 3:15 rather than 3:45, his blood-alcohol content would be closer to .10 at 4:15.

En route to the hospital, Batts told a paramedic: "I was going too fast, I was showing off, I lost it in the curve, and, boy, I was just being stupid." Later, in the emergency room before being placed under arrest, Batts declared that he "drove the car too fast around the curve and he lost control of the car" and that he "had perfect control of the vehicle until he went around the corner and that he lost control of the vehicle and he was showing off."

During his taped statement to the police, Batts stated, "I was coming around a slow corner, kind of like when the street just curves, the car started to cut off, so I gave it a little gas, the rear

end went into a spin and that's all I can remember." At trial, Batts' explanation of the collision coincided with this taped statement. Batts believed that the collision was caused when the automobile he was driving hesitated, causing him to accelerate and lose control of it.

Both the State and Batts introduced testimony from mechanics who had examined the automobile Batts had been driving at the time of the collision. The State's mechanic opined that from a stopped position to low speeds the automobile was capable of "stumbling," hesitating between the time when the accelerator is depressed and the time when the automobile actually accelerates. The mechanic who testified for Batts opined that as a result of several mechanical problems the automobile had, there was a possibility that the automobile could hesitate at speeds of 0 to 30 miles per hour. Neither the State's nor Batts' expert mechanics discovered a defect which would cause the automobile to accelerate by itself, both agreeing that the acceleration pedal would have to be physically depressed for the vehicle to accelerate.

The parties stipulated that decedent's death was the result of head and internal injuries he suffered as a result of the collision.

Section 28-306 provides:

> (1) A person who causes the death of another unintentionally while engaged in the operation of a motor vehicle in violation of the law of the State of Nebraska or in violation of any city or village ordinance commits motor vehicle homicide.
>
> . . . .
>
> (3) If the proximate cause of the death of another is the operation of a motor vehicle in violation of section 39-669.01, 39-669.03, or 39-669.07, motor vehicle homicide is a Class IV felony.

Neb. Rev. Stat. § 39-669.07 (Reissue 1988) provides in pertinent part:

> It shall be unlawful for any person to operate or be in the actual physical control of any motor vehicle:
>
> (1) While under the influence of alcoholic liquor or of any drug;
>
> (2) When such person has a concentration of

ten-hundredths of one gram or more by weight of alcohol per one hundred milliliters of his or her blood.

As used in § 39-669.07, the phrase "under the influence of alcoholic liquor" means after the ingestion of alcohol in an amount sufficient to impair to any appreciable degree the ability to operate a motor vehicle in a prudent and cautious manner. *State v. Thomte*, 226 Neb. 659, 413 N.W.2d 916 (1987); *State v. Burling*, 224 Neb. 725, 400 N.W.2d 872 (1987).

In order to convict Batts of felony motor vehicle homicide, the State was required to prove that Batts' driving in violation of § 39-669.07 proximately caused the death of the victim. See *State v. Ring, ante* p. 720, 447 N.W.2d 908 (1989).

To begin our discussion of Batts' assignment of error, we note that a verdict in a criminal case must be sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support that verdict. *State v. Johns, ante* p. 477, 445 N.W.2d 914 (1989). In determining the sufficiency of the evidence to sustain a criminal conviction, it is not the province of this court to resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence; such matters are for the finder of fact. *State v. Boham, ante* p. 679, 447 N.W.2d 485 (1989).

The record contains evidence sufficient to support the district court's judgment. A police officer concluded, based on Batts' demeanor and the fact that Batts was talkative, his breath smelled of alcohol, and he had bloodshot eyes, that Batts had been driving while under the influence of alcohol. A police officer's opinion testimony, based on personal observations of the defendant, is sufficient to sustain a finding that the defendant operated a motor vehicle when the defendant was under the influence of alcohol. *State v. Thomte, supra.*

Furthermore, the blood test revealed that at 5:25 p.m., just over an hour after the collision, Batts had a concentration of .13 grams of alcohol per hundred milliliters of blood. Although Batts' expert pathologist opined that assuming Batts drank the amounts and at the times he testified to, he would have had only a concentration of .08 grams of alcohol per hundred milliliters of blood at the time of the collision, the pathologist also

testified that if Batts had begun his drinking at 3:15 rather than 3:45, his blood-alcohol content would be closer to .10 at 4:15. Caccavari testified that Batts began drinking at 3:15, and in his taped statement Batts stated that he drank about two shots of liquor before going to the convenience store. Additionally, the pathologist's opinion assumes that Batts drank the amount he had testified to drinking. From Caccavari's testimony it can reasonably be concluded that Batts drank twice the amount he admitted in his testimony.

Finally, Batts stated that he felt lightheaded and that as he drove around the curve along Ridgewood Avenue, he was traveling too fast and was showing off and as a result lost control of his automobile. Both Caccavari and Anderson testified that Batts accelerated immediately prior to the collision and then began fishtailing out of control until colliding with Dickert-Heisch's automobile. Although there was evidence that the automobile Batts was driving was malfunctioning and that the street surface was slippery, the district court could have reasonably concluded that Batts lost control of his automobile as the result of being under the influence of alcohol and thus proximately caused decedent's death. Circumstantial evidence is sufficient to support a conviction if such evidence and the reasonable inferences that may be drawn therefrom establish guilt beyond a reasonable doubt. See *State v. Blue Bird*, 232 Neb. 336, 440 N.W.2d 474 (1989); *State v. Salas*, 231 Neb. 471, 436 N.W.2d 547 (1989). In a criminal case established by circumstantial evidence, the State is not required to disprove every hypothesis but that of guilt. See *State v. Blue Bird, supra*; *State v. Salas, supra*.

The record failing to sustain Batts' assignment of error, we affirm the judgment of the district court.

AFFIRMED.